

2007 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

7-5-2007

# Kaufmann v. GMAC Mtg Corp

Precedential or Non-Precedential: Non-Precedential

Docket No. 06-3019

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2007

## Recommended Citation

"Kaufmann v. GMAC Mtg Corp" (2007). *2007 Decisions.* Paper 810.
http://digitalcommons.law.villanova.edu/thirdcircuit_2007/810

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova University School of Law Digital Repository. It has been accepted for inclusion in 2007 Decisions by an authorized administrator of Villanova University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

**NOT PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 06-3019
_____

LINDA KAUFMANN,

Appellant,

v.

GMAC MORTGAGE
d/b/a
GENERAL MOTORS CORPORATION

_____

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(No. 04-cv-5671)
District Judge: Honorable R. Barclay Surrick

Submitted Under Third Circuit LAR 34.1(a)
June 19, 2007

Before: McKEE, FISHER, and CHAGARES, <u>Circuit Judges</u>.

_____

(Filed July 5, 2007)

OPINION OF THE COURT

CHAGARES, <u>Circuit</u> <u>Judge</u>.

Linda Kaufmann sued her former employer, GMAC Mortgage Corporation, for discrimination, harassment, and retaliation under the American with Disabilities Act (ADA) and the Pennsylvania Human Relations Act. She now appeals from the District Court's grant of summary judgment in favor of defendant. We will affirm.

**I.**

The facts are generally undisputed. We will only briefly present them.

Kaufmann began working in the Consumer Construction Loan Department at GMAC Mortgage Corporation in June of 2002. Within the first few days of working in that department, Kaufmann began experiencing severe allergic reactions to the perfumes worn by her coworkers. Her allergy symptoms included difficulty breathing, nose bleeds, and feeling faint. Kaufmann's supervisor, Lisa Richards, asked Kaufmann's co-workers to refrain from wearing perfume because of an unnamed employee's allergies, spoke to specific employees Kaufmann believed were wearing perfume, and had Kaufmann's desk moved. Richards, in consultation with Jennifer Aydelott of the Employee Relations Department and Bernard Smith, vice president in charge of managing the Consumer Construction Loan Department, took additional steps to protect Kaufmann from people wearing perfumes. Within a few weeks of her first allergic attack, GMAC changed the air filters in the area in which Kaufmann worked and provided Kaufmann with a personal air filter and fan for her desk. After these changes were implemented, Kaufmann emailed Richards that she believed a specific employee continued to wear something that caused her to react. Kaufmann suggested the employee might be wearing an Avon product, a

2

line of products to which she claimed to be particularly sensitive. Richards reminded all employees about the need to not wear perfume and specifically requested that employees refrain from using Avon products.

Kaufmann continued to experience allergic reactions. In August, she provided GMAC with a letter from her doctor explaining her respiratory symptoms required Kaufmann avoid exposure to environmental irritants. Smith then sent out a notice to all workers in the Construction Lending Department that the department was implementing a "perfume free environment." In addition, Kaufmann's desk was again moved to a more isolated area.

These steps seemed to work for a while, but on September 9, 2002, Kaufmann informed Richards that she smelled perfume and she was worried she would suffer an allergic attack. Richards spoke to the specific employee Kaufmann identified as wearing something with a scent. The employee denied wearing any perfume and Richards emailed Kaufmann that she (Richards) could not "smell anything of note."

On September 12, 2002, Kaufmann informed Richards, Smith, and Aydelott that her doctor recommended that she take a leave of absence to alleviate her symptoms and to better regulate her medication. She provided documentation from her doctor and took leave from September 16, 2002 through December 9, 2002 pursuant to the Family Medical Leave Act (FMLA).

Richards reminded all employees in the department to refrain from wearing perfume just before Kaufmann's return, and again at the end of March. From the time

3

Kaufmann returned from her leave to the time she was fired, she emailed Richards and Aydelott at least half a dozen times concerning her co-workers' use of perfume. Kaufmann emailed directly with employees that she believed were wearing scents. She also asked for additional accommodations, such as being allowed to miss a training meeting or participate in the training meeting by speaker phone. These requests were denied.

Both before and after Kaufmann's FMLA leave, supervisors expressed concern at Kaufmann's attendance and performance. Kaufmann was absent during normal working hours because of her allergies, dentist and doctor appointments, and for other reasons. On April 14, 2003, Richards questioned the integrity of Kaufmann's time card, and Smith reminded Kaufmann of the hours she was expected to be present. Two days later, in an email to Aydelott and Richards, Smith stated "Linda [Kaufmann]'s erratic attendance and inability to consistently apply herself for 8 hours per day is having a negative impact on the operations of the department and other associates here who have to consistently pick up after her when she has an unexcused absence." App. 174.

On May 6, 2003, after receiving an email from Kaufmann indicating she was leaving because she was beginning to react to someone's perfume, Smith emailed Aydelott and Richards, indicating he wanted to meet with Kaufmann "to explain to her this is not working out." App. 585. On May 8, 2003, Smith emailed Aydelott asking whether Kaufmann's termination was based on her poor performance or attendance, noting that Richards had a lack of written documentation regarding poor performance.

4

Adydelott responded that the approach to meeting with Kaufmann would be that "it is simply not working out for both sides." App. 588.

On May 12, 2003, Kaufmann sent an email to Aydelott, among others, explaining that she was being denied paid time off (PTO) because she failed to get prior approval before leaving work on May 6. Kaufmann demanded to know why she is "being treated differently than all the other employees in the department." App. 134. After twenty minutes passed, Kaufmann sent a follow-up email, stating "I feel like I am being harassed in my department." She received a response to her original email an hour and a half later, and that email explained Kaufmann had used all of her accrued PTO, and so company policy mandated that approval was required prior to taking additional time. App. 134.

The next day, Aydelott met with Kaufmann and terminated her employment. As she had discussed the previous week with Smith, Ayedlott had intended Kaufmann to sign a separation agreement, releasing GMAC of all claims in exchange for $5000, but Kaufmann never signed the agreement.

In December of 2003, Kaufmann filed a complaint in the Eastern District of Pennsylvania alleging that GMAC violated the ADA and the Pennsylvania Human Relations Act by failing to accommodate her disability, harassing her, and retaliating against her for protesting her lack of accommodation. In considering GMAC's motion for summary judgment, the District Court noted that the success or failure of Kaufmann's ADA claim would determine the success or failure of her Pennsylvania Human Relations Act claim because the statutes are coextensive. See Taylor v. Phoenixville School Dist.,

5

184 F.3d 296, 306 (3d Cir. 1999). The District Court found no genuine issues of material fact in dispute as to GMAC's efforts to accommodate reasonably Kaufman's alleged disability. The District Court also concluded that Kaufmann had not met her burden to show a causal connection between her termination and her attempts to seek accommodation. Accordingly, the District Court granted GMAC's motion for summary judgment. This timely appeal followed.

## II.

We have jurisdiction over the District Court's grant of summary judgment pursuant to 28 U.S.C. § 1291. We apply the same standard on appeal as the District Court should have applied in the first instance. See Elliot & Frantz, Inc. v. Ingersoll-Rand Co., 457 F.3d 312, 318 (3d Cir. 2006). We will affirm a grant of summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(C).

## III.

The ADA prohibits discrimination "against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). A qualified individual is one who, "with or without reasonable accommodation, can perform

6

the essential functions of the employment position that such individual holds or desires."

42 U.S.C. § 12111(8).

Discrimination under the ADA includes failing to accommodate reasonably "the known physical or mental limitations of an otherwise qualified individual with a disability" unless the individual's employer "can demonstrate that the accommodation would impose an undue hardship on the operation of the business." 42 U.S.C. § 12112(b)(5)(A). Reasonable accommodation includes such work-place changes as "job restructuring, part-time or modified work schedules, reassignment to a vacant position, acquisition or modification of equipment or devices, appropriate adjustment or modifications of examinations, training materials or policies, . . . and other similar accommodations for individuals with disabilities." 42 U.S.C. § 12111(9).

The District Court ruled that there were genuine factual disputes about whether Kaufmann has a disability under the ADA, but that there were no genuine factual disputes about whether GMAC provided Kaufmann reasonable accommodation. On appeal, Kaufmann argues that GMAC failed to accommodate reasonably because its perfume-free policy was not adequately enforced – people wearing products with scents came into contact with Kaufmann at work.

Kaufmann seems to claim that GMAC should have provided an absolutely odor-free environment in order to accommodate her but Kaufmann does not explain how it would be possible to create such a perfectly-sealed environment. See Turner v. Hershey Chocolate USA, 440 F.3d 604, 614 (3d Cir. 2006) ("In deciding whether a genuine issue

7

of material fact exists regarding the reasonableness of the requested accommodation, we first examine whether [plaintiff] has made a facial showing that her proposed accommodation is possible."). The record indicates products that affected Kaufmann were not necessarily noticeable by others, and so it would have been difficult to identify employees wearing lightly scented products before Kaufmann was exposed to them. It is unreasonable to expect GMAC could have prevented all violations of its perfume policy, but when employees were suspected of wearing scented products, Richards responded appropriately, reminding employees, individually and collectively, of the importance of keeping a perfume-free environment. Moreover, knowing that some scents would likely enter the environment, GMAC improved air quality for all employees, with a particular focus on Kaufmann's workspace, by changing the air filters, providing a new air filter, and providing a fan. The District Court concluded, and we agree, that GMAC met any obligations it had to accommodate Kaufmann's allergies.

Kaufmann also argues that she was harassed because of her disability and her attempt to seek accommodation. Succeeding on harassment would require showing that Kaufmann is a qualified individual with a disability under the ADA who was subject to unwelcome harassment based on her disability or request for accommodation. See Walton v. Mental Health Ass'n. of Southeastern Pennsylvania, 168 F.3d 661, 667 (3d Cir. 1999). Moreover, Kaufmann would have to show the harassment was sufficiently severe or pervasive to alter the conditions of her employment and to create an abusive working

8

environment, and that GMAC knew or should have known of the harassment but failed to take appropriate remedial action. Id.

Kaufmann asserts that she experienced harassment because her breaks were excessively monitored and she was not allowed to work overtime. Kaufmann does not, however, present any evidence that she was singled out among her co-workers in this treatment or that this was in any way inconsistent with GMAC policy. Kaufmann establishes neither that her supervisors' conduct regarding breaks and overtime was based on Kaufmann's disability, nor that it was sufficiently severe or pervasive so as to alter the conditions of her employment and create an abusive working environment. Kaufmann primarily supports her harassment claim by pointing to an email she sent to Aydelott in which she stated, "I feel like I am being harassed," but did not identify the harassing conduct. Pl. Br. 57. We are not convinced by this email, as it shows only that Kaufmann complained of what she characterizes as harassment. The email does not show that she actually suffered abusive conduct.

Kaufmann's final argument is that she was fired in retaliation for exercising her rights under the ADA. To succeed in a retaliation claim, Kaufmann would have to show that she engaged in protected activity, GMAC took adverse action either at the same time or after the activity, and a causal relationship existed between her protected activity and GMAC's adverse action. If Kaufmann establishes this prima facia case, GMAC has the burden to show a legitimate, non-retaliatory reason for its adverse employment action. The burden shifts back to Kaufmann then, to show GMAC's proffered non-retaliatory

reason did not actually motivate the employment action.  See Williams v. Philadelphia Housing Authority Police Dept., 380 F.3d 751, 760 n.3 (3d Cir. 2004).

Kaufmann contends that because the decision to terminate occurred immediately after she informed her supervisors that she was leaving work due to an allergic reaction, and because her actual termination occurred after she complained that her supervisor harassed her, the timing of these events suggests her protected activity caused her termination.  Kaufmann emailed Richards on May 6, saying that she had to step outside, and perhaps leave for the day, because of an allergic reaction.  Later that day, Smith emailed Aydelott and Richards that Kaufmann was not working out.  Then, on May 12, Kaufmann emailed Aydelott that she felt her supervisor was harassing her.  On the following day, Kaufmann was terminated.

Kaufmann's emails can be considered protected activity and temporal proximity of adverse employment action to protected activity can give rise to an inference of causality.  See Shellenberger v. Summit Bancorp, Inc., 318 F.3d 183, 189 & n.9 (3d Cir. 2003).  But, here, the decision to terminate Kaufmann was the conclusion of a discussion that began weeks prior to the complaints Kaufmann claims triggered the decision.  Smith had indicated to Richards and Aydelott in April that Kaufmann's absences and poor work performance were threatening her continued employment.

Even if we were to assume that Kaufmann succeeded in establishing causality and thus presented a prima facie case of retaliation, we cannot conclude that Kaufmann has shown GMAC used poor attendance as a pretext for her termination.  Kaufmann has failed

10

to "submit evidence which: 1) casts sufficient doubt upon . . . the legitimate reasons proffered by the defendant so that a factfinder could reasonably conclude that each reason was a fabrication; or 2) allows the factfinder to infer that discrimination was more likely than not a motivating or determinative cause" on the termination.  See Fuentes v. Perskie, 32 F.3d 759, 762 (3d Cir. 1994).  Kaufmann argues that Richards' deposition testimony undermines defendant's claim that Kaufmann was fired because of her attendance. Richards testified that she did not know why Kaufmann was leaving GMAC, but she assumed that Kaufmann left voluntarily.  Even though Richards' assumption was incorrect, her testimony does not contradict "the core facts put forward by the employer as the legitimate reason for its decision."  See Kautz v. Met-Pro Corp., 412 F.3d 463, 467 (3d Cir. 2005).  The record indicates Kaufmann's irregular attendance concerned her supervisors, both Richards and Smith, months before her termination.  Attendance is a legitimate reason for terminating Kaufmann, and Kaufmann has not presented evidence that suggests this reason was pretextual.

## IV.

For the foregoing reasons, we will affirm the District Court's grant of summary judgment.

11